IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34411-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CASSIE KAY ROBERTSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — Cassie Robertson appeals from convictions for possession of marijuana with intent to deliver and with a school bus stop enhancement, possession of methamphetamine, and possession of cocaine. On appeal, Robertson challenges the finding of probable cause that supported a search warrant and the sufficiency of the evidence to convict her of possession of marijuana. We affirm the validity of the search warrant and thereby affirm Robertson's convictions for possession of methamphetamine and cocaine. Robertson contends that, because of conflicting amendments during the 2013 legislature session to the statute defining the tetrahydrocannabinol (THC) level in cannabis, the State failed to prove a sufficient level of marijuana to convict her of

possession of marijuana because the State did not assay the green leaves seized without excluding THC acid. Based on RCW 1.12.025, we disagree and affirm Robertson's conviction for possession of marijuana. We later introduce other issues raised on appeal by Robertson.

## FACTS

In 2013 and 2014, the Washington State Legislature, as a result of the 2012 passage of Initiative 502, adopted a series of amendments to Washington's version of the Uniform Controlled Substances Act, chapter 69.50 RCW. The first and third amendments addressed the definition of marijuana, the level of THC needed to declare cannabis to be marijuana under the law, and the manner in which experts assay the level of THC. The second amendment, not intended to address the definition of marijuana, omitted the amending language from the first amendment. We will discuss the amendments in our legal analysis below. For now, we note that the State found marijuana in the possession of Cassie Robertson during the flux of the amendments.

The State convicted Cassie Robertson based on evidence of controlled substances gathered from her home during the execution of a search warrant. Since Robertson argues that the warrant lacked probable cause, we now relate facts found in a telephonic affidavit in support of the warrant.

Using a confidential informant, the Ephrata Police Department, in late January 2014, conducted a controlled buy from Cassie Robertson at her home on Sunset Street in

2

Ephrata. Officers searched the informant before the purchase ploy and found no contraband or money. The officers then gave the informant a ten-dollar bill with the serial number recorded and followed the informant to Robertson's residence. The informant entered the residence, exited the residence minutes later, and handed Ephrata Officer Ryan Harvey the purchased substance. Another search of the informant produced no money or contraband.

The confidential informant reported to Ephrata Police Department officers that Cassie Robertson welcomed the informant into her bedroom, where he viewed five plastic bags containing green leaves. Robertson directed the informant to select a "flavor." Clerk's Papers (CP) at 69. After the informant chose a flavor, Robertson weighed a small amount of the green leaves on a scale and placed the leaves into a smaller plastic bag. The informant handed Robertson the recorded bill. Ephrata Police Officer Jeff Wentworth later measured the green leaves as weighing 0.5 grams. Wentworth performed a field test on the green leaves and the greenery tested positive for marijuana.

The confidential informant also apprised Ephrata police officers that, inside Cassie Robertson's abode, he viewed white powder in small plastic bags, inside larger plastic bags. According to the informant, Robertson identified the white powder as cocaine and stated that the cocaine cost $180 per ball, an eighth of an ounce or 3.5 grams.

On January 23, 2014, at 2:45 a.m., Ephrata Police Officer Ryan Harvey

3

telephonically requested a warrant to search Cassie Robertson's Ephrata residence. During the recorded call, Officer Harvey explained, under oath, that the Ephrata Police Department had investigated Robertson for six weeks. The confidential informant had recently entered Cassie Robertson's home and observed marijuana and cocaine.

In his telephonic affidavit, Officer Ryan Harvey identified reasons why the confidential informant should be considered knowledgeable and reliable. The informant had purchased, sold, and used other controlled substances and had been convicted of violations of the controlled substances act. The informant previously engaged in controlled buys for the Ephrata Police Department, from which law enforcement discovered controlled substances.

In his affidavit, Officer Ryan Harvey also listed some of his own training and experience. Harvey received training for narcotics investigations and investigated other narcotics crimes.

A superior court judge authorized the search warrant to enter Cassie Robertson's home. The warrant authorized the seizure of marijuana, other controlled substances, drug paraphernalia, written records of drug sales, and control buy money.

We now forward to evidence presented at trial. On January 23, 2014, at 4 a.m., the Ephrata Police Department executed the warrant and recovered six bags of green leaves, the ten-dollar bill used in the control buy, white powder, and white crystals. After being read *Miranda* warnings, Robertson admitted to officers that she sold marijuana to

4

fund her drug habit for methamphetamine and cocaine.

Law enforcement forwarded the green leaves, the white powder, and the white crystals to the Washington State Patrol Crime Laboratory for testing. Sheri Jenkins, a forensic technician with the Washington State Patrol Crime Laboratory Division in Cheney, analyzed the leaves. Jenkins tested three samples of the green vegetable. Sample A contained 19.53 percent THC. Sample B contained 18.23 percent THC. Sample C contained 19.93 percent THC. The testing identified the white crystals as cocaine and the white powder as methamphetamine.

The crime laboratory's test did not distinguish between delta-9 THC and THC acid found in the samples. Delta-9 THC is the primary psychoactive ingredient in marijuana. THC acid is nonpsychoactive and must be converted to delta-9 THC to influence the user. When someone smokes cannabis, the acid transmogrifies into delta-9 THC through a chemical process called decarboxylation. We do not know if the State's testing machine could test solely for delta-9 tetrahydrocannabinol.

Ephrata Police Officer Ryan Harvey investigated the proximity of a school bus stop to Cassie Robertson's residence. Officer Harvey obtained, from the Ephrata School District, a list of locations of school bus stops within the district. Harvey identified two bus stops within a half block of Robertson's home. He drove to the locations and measured, with an Ephrata Police Department roller tape, the distance from each location to Robertson's residence. Officer Harvey never calibrated the roller tape or measured its

5

accuracy. At trial, Harvey explained how one uses the roller tape, and he demonstrated the roller's accuracy with a one-foot-long ruler. Officer Harvey confirmed the ruler's accuracy by comparing it to a standard, eleven and one-half inch long, yellow notepad. Harvey then testified that, using the roller tape, he measured the distance from each bus stop to the edge of Cassie Robertson's property. One distance reached 280 feet. Harvey noted that Robertson's property comprised a quarter of an acre.

## PROCEDURE

The State of Washington charged Cassie Robertson with one count of possession of marijuana with the intent to deliver, one count of possession of methamphetamine, and one count of possession of cocaine. The State alleged the crimes occurred on January 23, 2014, the date that Ephrata Police Department officers searched Robertson's home. The State later amended the information to add a school bus stop enhancement to the first charge. The State alleged that possession of the marijuana with intent to manufacture or deliver occurred within 1,000 feet of a school bus stop.

Before trial, Cassie Robertson sought an order quashing the search warrant for her home and suppressing evidence found during the search of her residence. The trial court denied the motion. Cassie Robertson waived a jury trial.

Forensic technician Sheri Jenkins testified at trial regarding her tests of the green leaves seized from Cassie Robertson's home. She admitted that her test did not distinguish between delta-9 tetrahydrocannabinol and THC acid.

6

The trial court convicted Cassie Robertson on all three charged counts and the school bus stop enhancement for the marijuana charge. Our trial record lacks any formal findings of fact. Nevertheless, the trial court wrote an extensive verdict after trial, which mentions findings resulting from the trial. Since we do not know if the trial court entered findings of fact not forwarded to us and since neither party complains about the lack of any findings of fact, we treat the verdict as containing the trial court's findings of fact and conclusions of law. The trial court found that Cassie Robertson admitted to officers that she sold marijuana in order to garner money to purchase cocaine and methamphetamine. The trial court noted the various levels of THC found in the three samples of marijuana tested by Sheri Jenkins. The court noted and impliedly found that the evidence failed to establish the THC content of delta-9 tetrahydrocannabinol alone. The trial court ruled, however, that the State did not need to establish the THC level by excluding THC acid and by delta-9 tetrahydrocannabinol alone.

The trial court sentenced Robertson to serve twelve months of community custody on a parenting sentencing alternative. A condition of community custody prohibited possession or consumption of controlled substances, including marijuana, without a prescription.

### LAW AND ANALYSIS

#### Probable Cause for Search Warrant

Cassie Robertson asks that we vacate all three of her convictions on the basis that

7

the Ephrata Police Department lacked probable cause for issuance of the search warrant for her home. She also contends that insufficient evidence supported her conviction for possession of marijuana with intent to deliver and insufficient evidence supported the school bus stop enhancement. Finally, Robertson challenges the community custody condition of abstaining from marijuana. We address the assignments of error in such order.

Cassie Robertson contends the trial court should have suppressed the controlled substances seized pursuant to the search warrant because probable cause did not support the warrant. Remember that the warrant application relied on a law enforcement officer's THC field test of green leaves purchased from Robertson by a confidential informant. She claims the field test could not measure concentration of THC such that law enforcement lacked probable cause for identifying the leaves as marijuana. Robertson notes that the legislature added THC concentration to the definition of marijuana in order to distinguish marijuana from hemp. The State responds that the trial court properly denied Robertson's motion to suppress because the field test in addition to other evidence supported a finding of probable cause.

We review the issuance of a search warrant for abuse of discretion. *State v. Maddox*, 152 Wn.2d 499, 509, 98 P.3d 1199 (2004). Trial courts accord great deference to a magistrate's determination of probable cause. *State v. Maddox*, 152 Wn.2d at 509; *State v. Clark*, 143 Wn.2d 731, 748, 24 P.3d 1006 (2001). We resolve any doubts in

8

favor of the validity of the warrant. *State v. Perez*, 92 Wn. App. 1, 4, 963 P.2d 881 (1998).

An affidavit suffices for the issuance of a search warrant if, on reading the affidavit, an ordinary person would understand that a criminal violation occurred and continued at the time of the application. *State v. Casto*, 39 Wn. App. 229, 232, 692 P.2d 890 (1984). Probable cause requires a nexus between criminal activity and the item to be seized and also a nexus between the item to be seized and the place to be searched. *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). Cassie Robertson's suspected criminal activity entailed the sale of marijuana and the possession of other controlled substances.

Cassie Robertson argues the marijuana field test performed on the green leaf substance obtained by the informant was legally inadequate because it could not measure THC concentration. In so arguing, Robertson omits reference to evidence that the confidential informant saw other controlled substances in Robertson's residence. We conclude that regardless of the presence of other controlled substances and regardless of whether anyone tested the marijuana, probable cause supported the search warrant. The probable criminal activity occurred within the area authorized to be searched.

Law enforcement often conducts controlled buys to establish probable cause before applying for a search warrant. *State v. Casto*, 39 Wn. App. at 232; *State v. Maffeo*, 31 Wn. App. 198, 199, 642 P.2d 404 (1982). If the informant enters a building empty

9

and returns with a controlled substance, law enforcement proves the informant's assertion that drugs were present and confirms the informant's reliability. *State v. Casto*, 39 Wn. App. at 234. When properly executed, a controlled buy provides the facts and circumstances necessary to satisfy probable cause. *State v. Steenerson*, 38 Wn. App. 722, 726, 688 P.2d 544 (1984).

*State v. Casto* parallels the instant case and permits the discovery of marijuana to support proximate cause regardless of any testing of the vegetable. In *State v. Casto*, this court addressed whether a warrant application supported the trial court's finding of probable cause when based on the report of a confidential informant. We discerned no merit in the defendant's contention that a deputy sheriff trained in marijuana identification must be able to testify to the nature and proportions of his testing chemicals. Chemical proof is not legally required.

Reliable information in Officer Ryan Harvey's telephonic search warrant affidavit established that Cassie Robertson handled marijuana, not hemp. Her instruction for the informant to pick a flavor corroborates that she intended the green leaves for consumption. The training and experience of Officer Ryan Harvey in narcotics investigations bolstered his identification of the green leaf substance as marijuana. The positive marijuana field test provided additional verifying, but unnecessary, evidence that confirmed the illegality of the marijuana sold by Robertson.

10

Cassie Robertson raises no other challenges to the validity of her convictions for possession of methamphetamine and cocaine. Therefore, we affirm her convictions on both charges.

Sufficient Evidence of Unlawful Marijuana

Cassie Robertson next contends that insufficient evidence supports her conviction for possession of marijuana with intent to deliver. She argues that the State failed to prove the green leaf substance to be marijuana. She maintains that we must apply a statutory definition of marijuana as cannabis with a THC concentration above 0.3 percent excluding THC acid. The State's test for THC concentration of Robertson's marijuana included the presence of THC acid. Robertson, therefore, claims the forensic testing by Sheri Jenkins failed to prove the substance met the statutory definition of marijuana. The State responds that Robertson's argument relies on a misinterpretation of the legislative history of the definition of marijuana and that we should apply a statutory definition that allows testing to include THC acid to arrive at a concentration exceeding 0.3 percent. We agree with the State and affirm Robertson's conviction.

Our resolution of this intriguing issue requires the court to review the recent legislative history of the definition of marijuana found in RCW 69.50.101. The legislature has occasionally altered the definition as to whether the marijuana must contain a certain concentration of THC, and, if so, the constituents of marijuana that forensic testers may weigh to measure the concentration. RCW 69.50.101 defines terms

that apply to the entire chapter 69.50 RCW, including RCW 69.50.401, the statute

prohibiting possession of marijuana with intent to deliver and under which the trial court

convicted Cassie Robertson.

RCW 69.50.101 currently declares, in relevant part:

> (w) "Marijuana" or "marihuana" means all parts of the plant
> *Cannabis*, whether growing or not, with a THC concentration greater than
> 0.3 percent on a dry weight basis; the seeds thereof; the resin extracted
> from any part of the plant; and every compound, manufacture, salt,
> derivative, mixture, or preparation of the plant, its seeds or resin. The term
> does not include:
> (1) The mature stalks of the plant, fiber produced from the stalks, oil
> or cake made from the seeds of the plant, any other compound,
> manufacture, salt, derivative, mixture, or preparation of the mature stalks
> (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized
> seed of the plant which is incapable of germination; or
> (2) Industrial hemp as defined in RCW 15.120.010.
> . . . .
> (ss) "THC concentration" means percent of delta-9
> tetrahydrocannabinol content per dry weight of any part of the plant
> *Cannabis*, or per volume or weight of marijuana product, or the combined
> percent of delta-9 tetrahydrocannabinol and tetrahydrocannabinolic acid in
> any part of the plant *Cannabis* regardless of moisture content.

Under the current code, the State presented sufficient evidence to convict Cassie

Robertson of possession of marijuana with intent to deliver. The definition of THC

concentration has undergone recent changes, however.

Before December 6, 2012, RCW 69.50.101 read, in part:

> (q) "Marijuana" or "marihuana" means all parts of the plant
> Cannabis, whether growing or not; the seeds thereof; the resin extracted
> from any part of the plant; and every compound, manufacture, salt,
> derivative, mixture, or preparation of the plant, its seeds or resin. The term

12

does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of the plant which is incapable of germination.

The statute made no reference to THC concentration. 2012's Initiative Measure 502 significantly decriminalized, under Washington law, the possession of marijuana in small amounts. The initiative, effective December 6, 2012, amended RCW 69.50.101 to include, within the definition of RCW 69.50.101, a minimum THC concentration. After the initiative, the statute read:

(s) "Marijuana" or "marihuana" means all parts of the plant Cannabis, whether growing or not, *with a THC concentration greater than 0.3 percent on a dry weight basis*; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. The term does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of the plant which is incapable of germination.

*(ii) "THC concentration" means percent of delta-9 tetrahydrocannabinol content per dry weight of any part of the plant Cannabis, or per volume or weight of marijuana product, or the combined percent of delta-9 tetrahydrocannabinol and tetrahydrocannabinolic acid in any part of the plant Cannabis regardless of moisture content.*

(Emphasis added).

The Washington Legislature added amendments to Initiative 502. On May 1, 2013, through Engrossed House Bill 2056 (EHB 2056), effective May 1, 2013, the

13

legislature amended the definition of THC concentration. The bill reads, in pertinent part:

Chapter 116
H.B. No. 2056

DRUGS AND MEDICINE—MARIJUANA—THC CONCENTRATION
AN ACT Relating to correcting the definition of THC concentration as adopted by Initiative Measure No. 502 to avoid an implication that conversion, by combustion, of tetrahydrocannabinol acid into delta-9 tetrahydrocannabinol is not part of the THC content that differentiates marijuana from hemp; amending RCW 69.50.101; and declaring an emergency.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF WASHINGTON:

**Sec. 1.** RCW 69.50.101 and 2013 c 12 s 2 are each amended to read as follows:

. . . .

(ii) "THC concentration" means percent of delta-9 tetrahydrocannabinol content per dry weight of any part of the plant *Cannabis*, or per volume or weight of marijuana product, *or the combined percent of delta-9 tetrahydrocannabinol and tetrahydrocannabinolic acid in any part of the plant Cannabis regardless of moisture content.*

(Second emphasis added.) EHB 2056 allowed forensic testers to include THC acid when analyzing THC content. The state governor signed EHB 2056 on May 1, 2013. Note that the stated purpose of EHB 2056 was correction of the definition of "THC concentration" to include conversion of THC acid.

On May 16, 2013, the legislature adopted a competing bill, Substitute Senate Bill 5416 (SSB 5416), effective July 28, 2013, that failed to recognize EHB 2056's inclusion of the final clause to the definition of THC. The Washington Governor signed the bill on May 16, 2013. Notably, however, when the legislature adopted SSB 5416, it did not

14

include and place a strike through "or the combined percent of delta-9

tetrahydrocannabinol and tetrahydrocannabinolic acid in any part of the plant Cannabis

regardless of moisture content," language previously added in EHB 2056. A strike

through language is the method employed by the legislature when it intends to remove

language from a statute. SSB 5416 reads, in relevant part:

CHAPTER 276
S.S.B. No. 5416
PRESCRIPTIONS—CONTROLLED SUBSTANCES—ELECTRONIC
FILING
AN ACT Relating to prescription information; amending RCW
69.41.010, 69.50.308, and 69.50.312; and reenacting and amending RCW
69.50.101.
BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF
WASHINGTON:
**Sec. 1.** RCW 69.41.010 and 2012 c 10 s 44 are each amended to
read as follows:
As used in this chapter, the following terms have the meanings
indicated unless the context clearly requires otherwise:

. . . .

(s) "Marijuana" or "marihuana" means all parts of the plant
Cannabis, whether growing or not, with a THC concentration greater than
0.3 percent on a dry weight basis; the seeds thereof; the resin extracted
from any part of the plant; and every compound, manufacture, salt,
derivative, mixture, or preparation of the plant, its seeds or resin. The term
does not include the mature stalks of the plant, fiber produced from the
stalks, oil or cake made from the seeds of the plant, any other compound,
manufacture, salt, derivative, mixture, or preparation of the mature stalks
(except the resin extracted therefrom), fiber, oil, or cake, or the sterilized
seed of the plant which is incapable of germination.

. . . .

(ii) "THC concentration" means percent of delta-9
tetrahydrocannabinol content per dry weight of any part of the plant
*Cannabis*, or per volume or weight of marijuana product.

15

Note that the legislature intended SSB 5416 to address electronic filing of prescriptions for controlled substances. The legislature did not design the bill to sculpt the definition of marijuana or THC concentration.

Finally, on April 2, 2014, the Washington Legislature adopted Engrossed Substitute House Bill 2304 (ESHB 2304), effective June 12, 2014. The bill returns the phrase "or the combined percent of delta-9 tetrahydrocannabinol and tetrahydrocannabinolic acid in any part of the plant Cannabis regardless of moisture content" to the definition of "THC" in RCW 69.50.101 and renumbers the subparagraph to "(kk)." The bill declares, in part:

CHAPTER 192
Engrossed Substitute House Bill No. 2304
MARIJUANA—PROCESSING—RETAIL LICENSES
AN ACT Relating to marijuana processing and retail licenses; amending RCW 69.50.325, 69.50.354, 69.50.357, 69.50.360, 42.56.270, and 69.50.535; and reenacting and amending RCW 69.50.101.
BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF WASHINGTON:
**Sec. 1.** RCW 69.50.101 and 2013 c 276 s 2 and 2013 c 116 s 1 are each reenacted and amended to read as follows:
Unless the context clearly requires otherwise, definitions of terms shall be as indicated where used in this chapter:
. . . .
(t) "Marijuana" or "marihuana" means all parts of the plant Cannabis, whether growing or not, with a THC concentration greater than 0.3 percent on a dry weight basis; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. The term does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks

16

(except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of the plant which is incapable of germination.

. . . .

((($\text{jj}$))) (kk) "THC concentration" means percent of delta-9 tetrahydrocannabinol content per dry weight of any part of the plant *Cannabis*, or per volume or weight of marijuana product, or the combined percent of delta-9 tetrahydrocannabinol and tetrahydrocannabinolic acid in any part of the plant *Cannabis* regardless of moisture content.

(Alterations in original.) Note that the bill suggests that the phrase "or the combined percent of delta-9 tetrahydrocannabinol and tetrahydrocannabinolic acid in any part of the plant Cannabis regardless of moisture content" did not change prior law. The legislature did not highlight the phrase in order to recognize the phrase as being added to RCW 69.50.101 by this third amendment.

Cassie Robertson committed her alleged crime of possession of marijuana on January 23 and 24, 2014. Robertson therefore astutely argues that the definition of THC concentration found in SSB 5416 controls her prosecution since the definition comes from the most recent enactment adopted by the legislature before January 2014. According to Robertson, SSB 5416 carried an effective date later than EHB 2056 and so SSB 5416 impliedly amended the definition of THC to no longer allow the addition of combustible THC acid to reach the 0.3 required weight. This interpretation would undermine the results of the THC concentration test performed by Sheri Jenkins because the THC test did not distinguish between THC acid and delta-9 THC. To address Robertson's marijuana conviction, we must resolve the anomaly created by the 2013

17

legislature's amendments to RCW 69.50.101 or what the trial court aptly labeled as "dueling legislation."

Cassie Robertson, in part, and the State ask us to implement principles of statutory interpretation in order to divine the intent of the legislature. We find these principles unhelpful in this setting. Our task is not to discern the meaning behind words employed by the legislature. None of the bills' language creates an ambiguity. EHB 2056 lucidly does not allow the combination of THC acid when measuring THC content. SSB 5416 patently permits the scientist to gauge THC content by including THC acid. We must determine which definition of THC concentration controls Robertson's prosecution.

The principle role of courts, under the doctrine of separation of powers, is to discern and apply legislative intent. *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 305, 268 P.3d 892 (2011). We conclude that the state legislature intended that, in January 2014, when Robertson possessed marijuana, the State be able to prove unlawful THC concentration by inclusion of THC acid in the measurement. The Washington Legislature passed EHB 2056, effective May 1, 2013, for the express purpose of amending the definition of THC concentration to permit inclusion of acid. The legislature declared its purpose as "correcting the definition of THC concentration as adopted by Initiative Measure No. 502 to avoid an implication that conversion, by combustion, of tetrahydrocannabinol acid into delta-9 tetrahydrocannabinol is not part of

the THC content that differentiates marijuana from hemp." The legislature considered the amendment critical such that it declared the legislation an emergency.

SSB 5416, adopted fifteen days later, omitted the correcting definition of THC concentration, but the legislature intended SSB 5416 to only address electronic prescription of drugs. SSB 5416 failed to note the amendment to the definition of THC caused by EHB 2056, because the later bill did not include the language of the earlier bill and place a strike through "or the combined percent of delta-9 tetrahydrocannabinol and tetrahydrocannabinolic acid in any part of the plant Cannabis regardless of moisture content," the method employed by the legislature when it intends to remove language from a statute. In the frequent rush of legislative business, the legislature erred.

Our discernment of the legislature's intent does not finish our analysis. The issue on appeal is not merely one of legislative intent. Instead a distinct statute aids us in resolving the dueling 2013 bills.

RCW 1.12.025(1) declares, in relevant part:

> (1) If at any session of the legislature there are enacted two or more acts amending the same section of the session laws or of the official code, each amendment without reference to the others, each act shall be given effect to the extent that the amendments do not conflict in purpose, otherwise the act last filed in the office of the secretary of state in point of time, shall control: PROVIDED, That if one or more special sessions of the same legislature shall follow any regular session, this rule of construction shall apply to the laws enacted at either, both, any, or all of such sessions.

19

We previously distinguished between the purposes of 2013's EHB 2056 and SSB 5416. On the one hand, the legislature intended the former statute merely to alter the definition of THC concentration to permit inclusion of acid. On the other hand, the state legislature wished the latter statute only to address electronic filing of prescriptions for controlled substances. The legislature did not design SSB 5416 to sculpt the definition of marijuana or THC concentration. Therefore, RCW 1.12.025 compels us to hold that the language of EHB 2056 controls the prosecution of Cassie Robertson. Thus, the State carried no burden to prove the THC level of the confiscated cannabis without the inclusion of acid.

## School Bus Stop Enhancement

Cassie Robertson contends the trial court erred when imposing a school bus stop sentence enhancement because the State failed to prove every element of the enhancement. The enhancement statute requires proof that Robertson sold drugs within one thousand feet of the bus stop, and the State supplied insufficient proof of the distance to support her enhancement. According to Robertson, the State's measurement suffered because the measuring device may have been inaccurate and the officer only measured to the edge of Robertson's property instead of to the room where the sale occurred. The State responds that its evidence sufficed because it showed the accuracy of the measuring instrument and the entirety of Robertson's property fell within the one thousand feet requirement. We agree with the State.

20

RCW 69.50.435 provides for an enhancement of the penalty imposed for a drug offense if the offense occurs within one thousand feet of a school bus zone. *State v. Johnson*, 116 Wn. App. 851, 861, 68 P.3d 290 (2003). RCW 9.94A.510(6) adds a mandatory twenty-four months sentence to the presumptive sentence for violation of RCW 69.50.435. *State v. Johnson*, 116 Wn. App. at 861. The State must prove each element of the enhancement beyond a reasonable doubt. *State v. Hennessey*, 80 Wn. App. 190, 194, 907 P.2d 331 (1995).

Cassie Robertson maintains that the State failed to make a prima facie case that the roller tape the officer used accurately measured distances. Results from a mechanical device lack relevancy and are therefore inadmissible unless the party offering the results makes a prima facie showing that the device functioned properly and produced accurate results. *State v. Bashaw*, 169 Wn.2d 133, 142, 234 P.3d 195 (2010), *overruled on other grounds by State v. Nunez*, 174 Wn.2d 707, 285 P.3d 21 (2012). Robertson relies on *Bashaw*. In *Bashaw*, the State presented no evidence the roller tape used was accurate. "No comparison of results generated by the device to a known distance was made nor was there any evidence that it had ever been inspected or calibrated." *State v. Bashaw*, 169 Wn.2d at 143.

In this appeal, the State tested the accuracy of the roller tape using a one-foot-long ruler and compared the ruler to a standard yellow pad. We conclude the comparison establishes the accuracy of the roller tape.

21

In addition to arguing the State failed to prove accuracy of the roller tape, Cassie Robertson argues the State failed to prove the distance element because Officer Ryan Harvey only measured to the edge of her property, when the actual drug sale occurred in her bedroom. The State responds that the trial court could have found the actual location of the offense to be within one thousand feet of the bus stop based on Officer Harvey's measurement of 280 feet to the lot, based on the officer's testimony that each lot is about a quarter acre, and based on a map of the block found in trial exhibit 25.

We hold that the trial court had sufficient evidence to find beyond a reasonable doubt that the drug offense occurred within one thousand feet of a school bus stop. First, Officer Ryan Harvey measured the distance from the stop to Cassie Robertson's lot. The distance was two hundred and eighty feet. Thus, Robertson's bedroom in her house would need to be located over seven hundred feet from edge of her property. Officer Harvey also testified that the lot was about a quarter acre in size. Using this information, the State shows how absurdly shaped Robertson's lot would need to be in order to accommodate a seven hundred feet distance on a quarter acre lot. The lot would need to be dramatically disproportionate. Finally, Officer Harvey testified the school bus stop was within half a block of Robertson's home. A trial court applying common sense and experience could find beyond a reasonable doubt that Robertson's home lay within the one thousand feet radius of the school bus stop.

Community Custody Condition

Cassie Robertson finally contends that the trial court violated her constitutional right to equal protection under the Washington Constitution when it barred her from using marijuana as a community custody condition. The State responds that Robertson's equal protection argument fails because the State has legitimate interests it protects through the imposition of a community custody condition. We decline to review Robertson's unpreserved constitutional argument because it was not manifest.

RAP 2.5(a) formalizes a fundamental principle of appellate review. The first sentence of the rule reads:

> **Errors Raised for First Time on Review.** The appellate court may refuse to review any claim of error which was not raised in the trial court.

No procedural principle is more familiar than that a constitutional right, or a right of any other sort, may be forfeited by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it. *United States v. Olano*, 507 U.S. 725, 731, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993).

Good sense lies behind the requirement that arguments be first asserted at trial. The prerequisite affords the trial court an opportunity to rule correctly on a matter before it can be presented on appeal. *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013). There is great potential for abuse when a party does not raise an issue below because a party so situated could simply lie back, not allowing the trial court to avoid the

23

potential prejudice, gamble on the verdict, and then seek a new trial on appeal. *State v. Weber*, 159 Wn.2d 252, 271-72, 149 P.3d 646 (2006). The theory of preservation by timely objection also addresses several other concerns. The rule serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials. Also, it facilitates appellate review by ensuring that a complete record of the issues will be available, and prevents adversarial unfairness by ensuring that the prevailing party is not deprived of victory by claimed errors that he had no opportunity to address. *State v. Strine*, 176 Wn.2d at 749-50.

Countervailing policies support allowing an argument to be raised for the first time on appeal. For this reason, RAP 2.5(a) contains a number of exceptions. RAP 2.5(a)(3) allows an appellant to raise for the first time "manifest error affecting a constitutional right." Constitutional errors are treated specially under RAP 2.5(a) because they often result in serious injustice and may adversely affect public perceptions of the fairness and integrity of judicial proceedings. *State v. Scott*, 110 Wn.2d 682, 686-87, 757 P.2d 492 (1998). However, "permitting *every possible* constitutional error to be raised for the first time on appeal undermines the trial process, generates unnecessary appeals, creates undesirable retrials and is wasteful." *State v. Lynn*, 67 Wn. App. 339, 344, 835 P.2d 251 (1992).

Cassie Robertson's equal protection argument implicates a constitutional right. This court must decide if the argument addresses "manifest error." Washington courts and even decisions internally have announced differing formulations for "manifest error." First, a manifest error is one "truly of constitutional magnitude." *State v. Scott*, 110 Wn.2d at 688. Second, perhaps perverting the term manifest, some decisions emphasize prejudice, not obviousness. The appellant must identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the appellant's rights. It is this showing of actual prejudice that makes the error manifest, allowing appellate review. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009). A third formulation is the facts necessary to adjudicate the claimed error must be in the record on appeal. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). To determine whether Robertson has shown actual error resulting in prejudice, we look to the substance of her claim.

"Washington Constitution article I, section 12, and the Fourteenth Amendment to the United States Constitution guarantee that persons similarly situated with respect to the legitimate purpose of the law must receive like treatment." *State v. Manussier*, 129 Wn.2d 652, 672, 921 P.2d 473 (1996). Washington courts have "consistently construed the federal and state equal protection clauses identically and considered claims arising under their scope as one issue." *State v. Manussier*, 129 Wn.2d at 672. "Strict scrutiny applies when a classification affects a suspect class or threatens a fundamental right."

25

*State v. Manussier*, 129 Wn.2d at 672–73. "An as-applied challenge to the constitutional validity of a statute is characterized by the 'allegation that application of the statute in the specific context' is unconstitutional." *State v. Shelton*, 194 Wn. App. 660, 666, 378 P.3d 230 (2016), *review denied*, 187 Wn.2d 1002, 386 P.3d 1088 (2017) (quoting *City of Redmond v. Moore*, 151 Wn.2d 664, 668-69, 91 P.3d 875 (2004). "If the state action does not threaten a fundamental or 'important' right, or if the individual is not a member of a suspect or semisuspect class, we apply a rational relationship or rational basis test." *State v. Osman*, 157 Wn.2d 474, 484, 139 P.3d 334 (2006).

In order to pursue an equal protection claim, the complaining person must establish that he or she is similarly situated with other persons. *State v. Handley*, 115 Wn.2d 275, 289-90, 796 P.2d 1266 (1990). Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made. *In re the Det. of Dydasco*, 135 Wn.2d 943, 951, 959 P.2d 1111 (1998). "Whether a defendant is similarly situated is an inquiry that is determined by and relative to the purpose of the challenged law." *State v. Pedro*, 148 Wn. App. 932, 946, 201 P.3d 398 (2009) (citing *State v. Manussier*, 129 Wn.2d at 673).

Cassie Robertson fails to show that she is receiving different treatment than other persons convicted of possession of marijuana with the intent to deliver. Instead, she compares herself to the general public arguing citizens have the freedom to consume

26

No. 34411-8-III
*State v. Robertson*

marijuana openly and publicly. Nevertheless, the State does not infringe equal protection when treating a convicted criminal differently than members of the public. Otherwise the constitution would not allow any incarceration or punishment. Robertson has failed to show an obvious error by the trial court or one of true constitutional magnitude.

CONCLUSION

We affirm Cassie Robertson's convictions for possession of methamphetamine and cocaine and possession of marijuana with intent to deliver. We also affirm her sentence enhancement and community custody conditions.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, J.

27